UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Steven Staehr and David Stueve,

       Plaintiffs,

v.                                                          Civil No. 10-1806 (JNE/FLN)
                                                               ORDER

Western Capital Resource, Inc., WERCS,
John Quandahl, Mark Houlton, Robert
Moberly, James Mandel, WCR, LLC, and
Blackstreet Capital Partners, II, LP,

       Defendants.

---

Andrew H. Bardwell, Esq., and Sean A. Shiff, Esq., Skolnick & Shiff, P.A. appeared for Plaintiffs Steven Staehr and David Stueve.

Richard G. Wilson, Esq., and Wayne S. Moskowitz, Esq., Maslon Edelman Borman & Brand, appeared for Defendants Western Capital Resource, Inc., WERCS, John Quandahl, Mark Houlton, Robert Moberly, James Mandel, WCR, LLC, and Blackstreet Capital Partners, II, LP.

---

Plaintiffs Steven Staehr and David Stueve bring this action against a company in which they hold stock, Western Capital Resource, Inc. (Western); current and former Western directors and officers (John Quandahl, Mark Houlton, and Robert Moberly[1]); and three business entities (WERCS; WCR, LLC; and Blackstreet Capital Partners, II, LP (Blackstreet)) that were involved in a transaction that transferred ownership of a controlling majority of Western stock. Specifically, the transaction at issue here is WERCS's sale of its controlling majority of shares of Western stock to Blackstreet.

Plaintiffs filed their original complaint in state court. Defendants removed the action to federal court on April 26, 2010. Plaintiffs filed a motion to remand for want of federal

---

[1]     James Mandel, a former Western director, was dismissed by stipulation.

1

jurisdiction on May 24, 2010.  The magistrate judge recommended denying that motion in a Report and Recommendation, which was adopted by this Court.  On October 22, 2010, Defendants filed a motion to dismiss arguing that Plaintiffs' claims were derivative in nature and that the complaint failed to comply with Federal Rule of Civil Procedure 23.1's pleading requirements for derivative claims.  In addition to responding to the motion to dismiss, Plaintiffs filed the Amended Complaint.  In a letter to this Court, Defendants stated that they were withdrawing their original motion to dismiss because the "Amended Complaint supersedes the original Complaint," and they filed a motion to dismiss the Amended Complaint.

## I.     BACKGROUND[2]

Plaintiffs hold common shares of Western.  Western is a Minnesota corporation headquartered in Nebraska.  Western's business is composed of two separate enterprises: payday lending and retail sales of prepaid wireless phones.  Western's payday lending arm is Wyoming Financial Lenders, Inc. (Wyoming Financial), and Western sells prepaid wireless phones with a chain of "Cricket" retail stores through its affiliate, PQH Wireless, Inc. (PQH).  Quandahl is Western's President, Chief Operating Officer, and Chief Financial Officer; a member of Western's board of directors; and "a shareholder of WERCS."  Houlton and Moberly were members of Western's board until the transaction at issue, and each is "a shareholder of WERCS."  Moberly is also WERCS's Chief Operating Officer.  WERCS is a Wyoming corporation headquartered in Wyoming.  Before selling its Western shares to Blackstreet, WERCS owned all of Western's preferred shares as well as some shares of Western's common stock, giving it a majority of Western's share votes.  Blackstreet is a Delaware limited partnership and is headquartered in Maryland.  Plaintiffs do not allege where WCR is organized

---

[2]     The facts stated below are taken from the Amended Complaint.

or headquartered. But they do allege that WCR is the Blackstreet affiliate that aided in WERCS's sale of all of its Western shares to Blackstreet.[3]

In 2009 Western hired a consulting firm, B&L Capital, to advise Western on its capital needs and to possibly facilitate deals with third parties who might be interested in providing Western with capital or otherwise engaging in a transaction with Western. In November 2009 Blackstreet sent, by way of Blackstreet Capital Management, LLC, a non-binding letter of intent to B&L Capital proposing terms for a purchase of substantially all of Western's assets, namely, Wyoming Financial and PQH. In January 2010 Blackstreet Capital Management furnished Western with a revised non-binding letter of intent, and on January 10, 2010, Western's board met to decide whether to go forward with the sale of Western's assets to Blackstreet. On January 13, 2010, Western executed a non-binding letter of intent to sell all of its assets to Blackstreet. Blackstreet Capital Management then conducted a due-diligence examination of Western. The due diligence was conducted pursuant to a non-disclosure agreement entered into by Western and Blackstreet Capital Management shortly after the non-binding letter of intent was executed.

Plaintiffs allege that this transaction would have benefitted holders of preferred shares to the detriment of holders of common shares. According to Plaintiffs, the asset sale would have left Western with little to no assets except for the cash from the sale, which, presumably, would have been consumed by Western's debts and holders of Western's preferred shares, leaving

---

[3] The Amended Complaint is inconsistent in its description of WCR. WCR is named as a party in the caption, and the Amended Complaint describes WCR as participating in the negotiations of the stock sale. But the Amended Complaint also states that "WCR Acquisition, Inc. (an affiliate of [Blackstreet])" executed the Stock Purchase and Sale Agreement with WERCS and Blackstreet. (Am. Compl. ¶ 37) Defendants cite paragraph 37 of the Amended Complaint for the proposition that WCR facilitated the sale to Blackstreet, even though that paragraph refers to WCR Acquisition, Inc. Perhaps WCR Acquisition, Inc., is a member of WCR, which is named in the caption as an LLC.

holders of common shares empty-handed.[4]  Because of the asymmetrical benefit of the sale, Plaintiffs and other holders of common shares contacted Western and its legal counsel to express their objections to the sale.  Through these communications, it became clear to Western that many of the holders of Western's common shares would exercise their statutory dissenters' rights available under Minnesota law.  Pursuant to these rights, Western would have been required to buy the dissenters' shares at a price determined by appraisal litigation in state court.  Faced with this prospect, Western abandoned the asset sale.

On January 26, 2010, Western contacted Blackstreet Capital Management, explained its desire to avoid the dissenters' rights process, and stated that it was unsure of whether it would proceed with the sale of assets to Blackstreet.  Just after that conversation, Blackstreet Capital Management contacted WERCS and inquired about purchasing all of the Western stock that WERCS owned.  That same day, Blackstreet Capital Management sent a non-binding letter of intent to WERCS proposing terms for the sale and purchase of all of WERCS's Western stock.  Blackstreet Capital Management also indicated to Western that it would not continue negotiations for the sale of Western's assets pursuant to the terms of the non-binding letter of intent executed by Western.  Two days after receiving its non-binding letter of intent from Blackstreet Capital Management, WERCS executed it, and WERCS's counsel began drafting a Stock Purchase and Sale Agreement that would govern the transaction.

On February 1, 2010, Western requested that it be released from its non-binding letter of intent with Blackstreet Capital Management.  Blackstreet Capital Management agreed and

---

[4] The Court notes that Plaintiffs quote Mandel's letter of resignation from Western's board in the Amended Complaint.  In the letter, Mandel expresses his concern that the board's actions have not been in the common shareholders' interest and that the sale to Blackstreet "left the common shareholder[s] naked in their representation and succinctly subject to the narrow interests of the new majority."  (Am. Compl. ¶ 53)  Mandel also states that his "worst case scenarios" were based upon "pure speculation."

4

received, in consideration for terminating the letter of intent, permission to use the due-diligence information for the assessment of the transaction with WERCS; the use of the due-diligence information would have otherwise been prohibited under the non-disclosure agreement between Western and Blackstreet Capital Management.

Blackstreet Capital Management and WERCS negotiated the terms of the sale over the next several weeks. The terms included the following: a requirement that Quandahl continue in his employment at Western with the same salary and the possibility of cash bonuses;[5] a requirement that Wyoming Financial refinance a loan to remove Moberly as guarantor of the debt; and a closing requirement that Western's Articles of Incorporation be amended to opt out of Minnesota's control share acquisitions statute (MCSAS). MCSAS hinders hostile takeovers by limiting a share acquirer's voting rights. In this case, MCSAS would have prevented Blackstreet from voting its newly acquired shares of Western. On February 23, 2010, WERCS, WCR, and Blackstreet executed the Stock Purchase and Sale Agreement.

On February 24, 2010, WERCS demanded, pursuant to Western's bylaws, a special shareholder meeting and vote on its proposal to exempt Western from MCSAS. As a result of that demand, Western's board set a special meeting date to vote on WERCS's proposal and it issued a proxy statement in connection with that vote. Plaintiffs allege several "material deficiencies" with the proxy statement—specifically, the proxy statement inadequately disclosed: (1) the process used by B&L Capital to solicit offers to compete with Blackstreet's offer to purchase Western's assets; (2) strategic alternatives to the asset sale considered by the board; (3) the "sum and substance" of information given to prospective "bidders" in comparison to that given to Blackstreet; (4) the "sum and substance of the discussions between defendants and

---

[5] Presumably, Blackstreet would use its controlling majority to ensure that Quandahl continued in his role at Western.

[Blackstreet]"; and (5) "the analysis that B&L Capital, LLC used to render its fairness opinion." (Am. Compl. ¶ 56) At the special shareholder meeting, WERCS's proposal to opt out of MCSAS passed based on WERCS's majority of share votes. Plaintiffs allege that WERCS was prohibited from voting its shares under Minnesota law.

The allegations in the Amended Complaint are muddled as to whether the sale of WERCS's stock to Blackstreet actually occurred. The Amended Complaint refers to the transaction as "proposed" (Am. Compl. ¶ 45) and does not explicitly state when it occurred. On the other hand, it refers to WERCS as the "former holder" of Western's preferred shares. (Am. Compl. ¶ 46) In their memorandum in support of their motion to dismiss, Defendants indicate, citing a proxy statement filed with the SEC, that the transaction between WERCS and Blackstreet took place on March 31, 2010. Reading the Amended Complaint as a whole, it alleges that the sale between WERCS and Blackstreet took place around the end of March.

Plaintiffs also allege that the following side deals between various Defendants constitute self-dealing and the "fleecing" of Western: (1) Western entered into a consulting agreement with Blackstreet; (2) Western elected Richard Miller, an "affiliate of Blackstreet," to its board of directors; and (3) in April 2010 WERCS made a $2,000,000 one-year term loan to Wyoming Financial with a fixed interest rate of 12% and a balloon payment of $2,000,000 plus unpaid interest due in April 2011. The loan allowed Wyoming Financial to pay off a $1,637,341 loan to a third party. The paid-off loan had a 7.49% interest rate and was personally guaranteed by Moberly.

Based on these allegations, Plaintiffs bring three counts: (1) breach of fiduciary duty against Quandahl, Moberly, and Houlton, the individual Defendants; (2) aiding and abetting breach of fiduciary duty against all Defendants; and (3) a request for a declaration of Plaintiffs'

rights and Defendants' obligations regarding the proxy statement, the Stock Purchase and Sale Agreement, and the vote to render MCSAS inapplicable.

## II. DISCUSSION

### A. Breach of fiduciary duty

1. Dismissal under Federal Rule of Civil Procedure 23.1

Defendants argue that the Amended Complaint, including counts based on any breach of fiduciary duty, should be dismissed because the Amended Complaint fails to comply with the strictures of Federal Rule of Civil Procedure 23.1, which defines certain pleading requirements for shareholder derivative actions. Rule 23.1 states:

> The complaint must be verified and must:
>
> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
>
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
>
> (3) state with particularity:
>
> > (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> >
> > (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b). Defendants argue that the complaint fails to state with particularity the efforts made by Plaintiffs to obtain their desired actions from Western's board of directors. Plaintiffs respond that their action is direct rather than derivative and that even if their claims are derivative, futility excuses their failure to make a demand on the board.

7

Whether a claim is derivative or direct is a question of state law. *See Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 492 (8th Cir. 2004). A shareholder asserting a cause of action belonging to the corporation must assert "a 'derivative' action on behalf of the corporation rather than in a direct action by the individual shareholder." *Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 617 (Minn. 1995). The test for determining whether a claim is direct or derivative is "whether the injury to the individual plaintiff is separate and distinct from the injury to other persons in a similar situation as the plaintiff." *Id.* "If the injury is not separate and distinct, only a derivative action is available." *Popp Telecom, Inc.*, 361 F.3d at 492. The Minnesota Supreme Court has also stated that "[i]n determining whether a claim is direct or derivative, we have focused the inquiry to whether the complained-of injury was an injury to the shareholder directly, or to the corporation." *Wessin v. Archives Corp.*, 592 N.W.2d 460, 464 (Minn. 1999). Further, waste and misappropriation of corporate assets "are traditional derivative claims that rightfully belong to the corporation." *Id.* at 465.

The Amended Complaint, read as a whole, alleges four types of injury caused by Defendants: (1) injury to Plaintiffs' rights to dissent caused by the individual Defendants' failure to sell Western's assets; (2) injury to Plaintiffs' voting rights caused by the improper proxy statement; (3) injury to Plaintiffs' voting rights caused by allowing ineligible shares to vote; and (4) injury to "shareholder value" caused by Defendants' alleged self-dealing and corporate waste.

Plaintiffs argue that the first three types of injuries are injuries to their contractual and statutory rights as shareholders and therefore form the basis of direct claims. The Court does not reach this issue because it will assume, without deciding, that the alleged injuries to voting and

dissenting rights form the basis of direct claims and dismiss the claims based on those injuries pursuant to Federal Rule of Civil Procedure 12(b)(6).

The Court concludes, however, that the fourth type of injury pled by Plaintiffs is derivative. Plaintiffs argue that Defendants harmed "shareholder value" by failing to pursue the initial asset sale to Blackstreet or some other buyer and, instead, negotiating and facilitating a sale of WERCS's shares to Blackstreet with terms that would provide them with undue benefits at the expense of the corporation and the common shareholders. This harm was suffered by all shareholders equally through a decrease in the value of their shares. Ultimately, the injury was to the corporation caused by Defendants' alleged self-dealing and waste, and was therefore only an indirect injury to Plaintiffs through share value. This injury therefore gives rise to "traditional derivative claims that rightfully belong to the corporation." *Wessin*, 592 N.W.2d at 465.

Because Plaintiffs' claims based on injury to "shareholder value," "stockholder value," the "value of their shares," and the like are derivative in nature they must be pled pursuant to Rule 23.1. Defendants argue that Plaintiffs have not complied with Rule 23.1 because Plaintiffs did not sufficiently plead the futility of making a demand on the board. Plaintiffs argue that futility excuses their failure to make a demand on the board because a majority of the board engaged in egregiously wrong conduct. The parties agree that the futility issue is governed by Minnesota law.

> We have indicated that a shareholder bringing a derivative action must first demand that the board itself pursue the action. *See PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 5, 6 n.12 (Minn. 1990). The demand requirement may be excused, however, when the board suffers from a conflict of interest regarding the subject matter of the derivative suit. *See Winter v. Farmers Educ. & Coop. Union of Am.*, 107 N.W.2d 226, 233 (Minn. 1961) ("Ordinarily a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board . . . .").

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 754 N.W.2d 544, 551 n.5 (Minn. 2008).

The threshold issue presented by the parties regarding futility is whether Plaintiffs were required to make a demand on Western's board at the time of the filing of the Amended Complaint, which was after the sale of WERCS's Western shares and after Moberly, Houlton, and Mandel had been replaced as board members. Neither Plaintiffs nor Defendants cite any controlling Minnesota law, but Defendants cite several cases from other jurisdictions applying the Delaware rule set forth in *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006). Plaintiffs argue that these cases do not apply here because they are based on "a Delaware case applying Delaware law." (Resp. 26) Derivative actions are uncommon in Minnesota. *See Janssen v. Best & Flanagan*, 662 N.W.2d 876, 882 (Minn. 2003) (noting that derivative lawsuits are "not an everyday occurrence in Minnesota's courts"). While Minnesota courts have not expressly adopted Delaware law on the issue of demand futility, Minnesota courts have looked to it for guidance on other issues in the past. *See, e.g.*, *In re UnitedHealth Grp., Inc. S'holder Derivative Litig.*, 754 N.W.2d at 551 (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995)); *PJ Acquisition Corp.*, 453 N.W.2d at 7 (citing *Schreiber v. Bryan*, 396 A.2d 512 (Del. Ch. 1978)); *Lansky v. NWA, Inc.*, 471 N.W.2d 713, 714 (Minn. Ct. App. 1991) (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162 (Del. 1989)). Moreover, Plaintiffs explicitly rely on Delaware law in other portions of their brief. In the absence of any argument or reasoning suggesting an alternative rule, the Court will apply the sensible one set forth in *Braddock*:

> [W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation. Three circumstances must exist to excuse a plaintiff from making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place: first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal;

10

and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint.

*Braddock*, 906 A.2d at 786. Because the Amended Complaint was the first to plead a derivative claim, there was no "well pleaded . . . derivative action" before the new board was in place, and Plaintiffs were required to make a demand upon the board as it was constituted at the time the Amended Complaint was filed.

Plaintiffs' arguments about Moberly's and Houlton's biases and egregious conduct are therefore not relevant to the futility issue. Nevertheless, Plaintiffs maintain that it would have been futile to make a demand on the new board because Quandahl remained a member, two other members were "appointed by agreement of Blackstreet and Defendant Quandahl," and a fourth member is "an affiliate of Blackstreet." Plaintiffs cite no law supporting their argument that a demand is futile merely because a majority of the board was appointed by a defendant or is an affiliate of a defendant. The pled facts contain no allegation that the three new, allegedly "interested" board members have engaged in any past wrongdoing or would otherwise be unlikely to respond in good faith to Plaintiffs' demand. Plaintiffs' futility argument therefore fails.

Plaintiffs' claims based on damage to "shareholder value" are derivative and have not been pled in accordance with Rule 23.1 because Plaintiffs have not alleged sufficient facts to allow the Court to conclude that it would have been futile for them to make a demand on Western's board as comprised when the Amended Complaint was filed. The Court will therefore dismiss the claims without prejudice.[6]

---

[6] Because the Court dismisses Plaintiffs' "shareholder value" claims based on Plaintiffs' failure to meet the requirement of a board demand, it does not reach the parties' arguments regarding a potential duty to sell the corporation under *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

11

2.      Dismissal under Federal Rule of Civil Procedure 12(b)(6)

Next, the Court considers whether Plaintiffs' remaining claims, those based on the alleged injuries to Plaintiffs' dissenting and voting rights, survive Defendants' motion to dismiss. They do not. When ruling on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept the facts alleged in the complaint as true and grant all reasonable inferences in favor of the plaintiff. *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009). Although a complaint is not required to contain detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs argue that their dissenting rights were violated because Defendants did not pursue a sale of substantially all of Western's assets. *See* Minn. Stat. §§ 302A.661, subd. 2, 302A.471(b) (2010) (dissenting rights triggered by sale or disposition of "all or substantially all of [a corporation's] property and assets"). Plaintiffs allege that they would have exercised these rights because of "concern about the value of their Common Stock and the value of the Company in the event that substantially all of the assets of [Western] were sold." (Am. Compl. ¶ 31) Plaintiffs have pled no violation of their dissenting rights because Defendants never engaged in any action that would have triggered dissenting rights: Plaintiffs allege that Defendants abandoned their plan to engage in a transaction that would have triggered those rights.

Plaintiffs also argue that their right to vote on the amendment to opt out of MCSAS was violated because Defendants improperly allowed interested shares, namely WERCS's, to vote. Under Minnesota law, "interested shares" were not allowed to vote on the amendment to opt out of MCSAS. Minn. Stat. § 302A.671, subd. 1, 4a (2010). Interested shares are defined as:

> [T]he shares of an issuing public corporation beneficially owned by any of the following persons: (1) the acquiring person, (2) any officer of the issuing public corporation, or (3) any employee of the issuing public corporation who is also a director of the issuing public corporation.

Minn. Stat. § 302A.011, subd. 42 (2010). Plaintiffs argue that WERCS's shares were "beneficially owned" by Quandahl, Moberly, and Houlton under Minnesota Statutes section 302A.011, subdivision 41 (2010), which states:

> (a) "Beneficial owner," when used with respect to shares or other securities, includes, but is not limited to, any person who, directly or indirectly through any written or oral agreement, arrangement, relationship, understanding, or otherwise, has or shares the power to vote, or direct the voting of, the shares or securities or has or shares the power to dispose of, or direct the disposition of, the shares or securities[.]
>
> . . . .
>
> (b) "Beneficial ownership" includes, but is not limited to, the right to acquire shares or securities through the exercise of options, warrants, or rights, or the conversion of convertible securities, or otherwise. The shares or securities subject to the options, warrants, rights, or conversion privileges held by a person shall be deemed to be outstanding for the purpose of computing the percentage of outstanding shares or securities of the class or series owned by the person, but shall not be deemed to be outstanding for the purpose of computing the percentage of the class or series owned by any other person. A person shall be deemed the beneficial owner of shares and securities beneficially owned by any relative or spouse of the person or any relative of the spouse, residing in the home of the person, any trust or estate in which the person owns ten percent or more of the total beneficial interest or serves as trustee or executor or in a similar fiduciary capacity, any organization in which the person owns ten percent or more of the equity, and any affiliate of the person.
>
> (c) When two or more persons act or agree to act as a partnership, limited partnership, syndicate, or other group for the purposes of acquiring, owning, or voting shares or other securities of a corporation, all members of the partnership,

> syndicate, or other group are deemed to constitute a "person" and to have acquired beneficial ownership, as of the date they first so act or agree to act together, of all shares or securities of the corporation beneficially owned by the person.

Under subdivision 41(a), Quandahl, Moberly, and Houlton could be the beneficial owners of WERCS's shares if they directly or indirectly had or shared the power to vote WERCS's shares. The Amended Complaint contains allegations that the three individual Defendants were shareholders of WERCS's stock, were "trustees" of WERCS, and that Moberly was WERCS's Chief Operating Officer (COO). The Amended Complaint does not allege the percentages of WERCS shares owned by the individual Defendants; it does not contain any explanation of what it means to be a WERCS trustee; and it does not contain any allegation concerning Moberly's responsibilities and powers as COO. Notably absent from the Amended Complaint is an allegation that the individual Defendants had or shared the power to vote WERCS's Western shares. Accordingly, these facts are not sufficient to allow a reasonable inference that any of these individuals had or shared in the power to vote WERCS's Western shares. Under subdivision 41(b) and (c), Quandahl, Moberly, and Houlton, beneficially owned WERCS's shares if they individually possessed at least a 10% interest in WERCS, or they were acting in concert under subdivision 41(c) and collectively possessed at least a 10% interest in WERCS. Although the Amended Complaint alleges that Quandahl, Moberly, and Houlton were shareholders of WERCS, it makes no allegation concerning the percentage of their holdings, individually or otherwise, and counsel does not assert that it does. Accordingly, the Amended Complaint does not allege sufficient facts to allow the conclusion that Quandahl, Moberly, or Houlton beneficially owned the Western shares held by WERCS, and Plaintiffs' argument that WERCS's Western shares were interested must be rejected. The Court therefore concludes that

Plaintiffs have failed to allege sufficient facts to support their conclusion that interested shares improperly voted on the amendment to opt out of MCSAS.

Regarding the injury to voting rights based on the insufficiency of the proxy statement, Defendants argue that Plaintiffs have no claim because the proxy statement, insufficient or otherwise, could have caused no injury to Plaintiffs because the statements could not have changed the outcome of the vote. Under Defendants' theory, WERCS would have cast its votes in favor of the amendment regardless of what the proxy statement said, and so the amendment would have passed even if all of the common shareholders would have voted no. Plaintiffs urge the Court to reject this argument because WERCS improperly voted its shares. But Plaintiffs' premise that WERCS's shares were interested is rejected above, and the Court therefore accepts Defendants' argument on causation. Because Plaintiffs failed to allege any injury caused by the alleged deficiencies in the proxy statement, they have no actionable breach of fiduciary duty claim based on the proxy statement.

**B.    Aiding and abetting breach of fiduciary duty and declaratory judgment counts**

Plaintiffs' aiding and abetting and declaratory judgment counts are premised on the underlying wrongs alleged in their breach of fiduciary duty count. Because, as discussed above, that underlying count fails, these counts do as well.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' motion to dismiss the Amended Complaint [Docket No. 46] is GRANTED.

    2. This action is DISMISSED without prejudice.[7]

    LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 6, 2011

                                                  s/ Joan N. Ericksen
                                                JOAN N. ERICKSEN
                                                United States District Judge

---

[7] The Court exercises its discretion to dismiss the action without prejudice. *See* Fed. R. Civ. P. 41(b).